IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
June 15, 2004 Session

## STATE OF TENNESSEE v. TIMOTHY WADE DAVIS

**Direct Appeal from the Criminal Court for Knox County**
**No. 69067     Richard Baumgartner, Judge**

---

**No. E2003-02162-CCA-R3-CD - Filed October 25, 2004**

---

The defendant, Timothy Wade Davis, was convicted by a jury of four counts of rape of a child and one count of aggravated sexual exploitation of a minor. Sentences of twenty-two years were imposed for each child rape conviction and ten years for aggravated sexual exploitation of a minor. Three of the child rape convictions and the especially aggravated sexual exploitation of a minor were ordered to run consecutively for an effective sentence of seventy-six years at 100%. The defendant appeals his convictions and sentencing and alleges that the trial court erred in the following respects: (1) in failing to suppress the search warrant and the defendant's statements; (2) by denying the defendant the right to represent himself; (3) by refusing to instruct the jury on insanity; (4) in finding the defendant competent to stand trial; and (5) in regard to sentencing. After review of the issues presented and the record as a whole, we conclude that no reversible error was present and affirm the convictions and sentencing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which THOMAS T. WOODALL, JJ., joined. JOSEPH M. TIPTON, J., filed a separate concurring opinion.

Bruce Poston, Knoxville, Tennessee; Mark E. Stephens, District Public Defender; and John Halstead, Assistant Public Defender, for the appellant, Timothy Wade Davis.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Leland Price, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendant, Timothy Wade Davis, was indicted in an eight-count indictment. Counts one through six were for rape of a child, a Class A felony; count seven charged especially aggravated sexual exploitation of a minor, a Class B felony; and count eight charged exhibition of harmful materials to minors, a Class A misdemeanor. The trial court granted the State's motion to dismiss

in two counts of rape of a child and ordered the defendant's acquittal on count eight, exhibition of harmful materials to minors. A jury returned guilty verdicts on all remaining charges.

The defendant was sentenced to twenty-two years on each of the four child rape convictions and ten years for the especially aggravated sexual exploitation of a minor. Three of the child rape convictions were ordered to run consecutively, as was the especially aggravated sexual exploitation of a minor, for a total effective sentence of seventy-six years at 100%.

The defendant appeals his convictions and sentencing and presents five issues for review:
1) The validity of the search warrant issued for the defendant's residence and the failure to suppress the defendant's statements as fruits of an invalid search;
2) Whether the trial court properly denied the defendant's request to represent himself;
3) Whether the trial court erred in refusing to instruct the jury on the definition of insanity;
4) Whether the trial court erred in ruling that the defendant was competent to stand trial; and
5) Whether the trial court erred in sentencing the defendant.

**Facts**

This case concerns sexual abuse of a very young female victim by a trusted adult friend of the victim's parents. The victim's mother testified that the defendant had been a friend of their family for over twenty years. She said the defendant was a regular visitor in their home on weekends and once had gone on vacation with the family. Her daughter, the victim herein, was born September 28, 1990. The defendant had built a swing for the victim and would engage in playing ball and other playful activities with the victim. After the victim entered the first grade, the defendant began taking the victim to Fountain City Park with the permission of the victim's parents. The visits to the park occurred on numerous unspecified dates between May of 1997 and June of 1999.

The defendant had lived with his parents until mid-1998, when he acquired his own home in Halls. The victim's mother learned in May of 1999 that the defendant had been taking the victim to his home. These visits had not been with the permission of the victim's parents. During the last week in June of 1999, the victim made statements to her mother of possible sexual abuse by the defendant. The mother reported the allegations to the Knoxville Police, and she was referred to a counselor at Childhelp USA.

On cross-examination, the victim's mother stated that the defendant did chores for her family, such as cutting the lawn. She admitted that she and her husband contacted a civil lawyer before meeting with DCS or the police. She stated that she and the victim provided information to the police that was used to obtain a search warrant for the defendant's home.

The victim was twelve years old at the time of trial. She testified she was six or seven when the defendant began touching her private parts. She stated that the defendant exposed his penis to her while at the defendant's residence. She said the defendant attempted to penetrate her "front private" with his penis and did so to the length of her fingernail. The defendant desisted when she told him it hurt. She testified that the defendant also attempted penile penetration of her "back private," as well as placing his penis in her mouth. These occurrences happened "[a]bout every weekend" according to the victim. The victim recounted one incident at her house when she and the defendant were alone. The defendant had her pull down her pants and press her rear to the window, exposing her to drive-by traffic. The defendant had his pants down then but the victim could not recall whether he touched her on this occasion. She described another occasion when the defendant had her get into a filled bathtub while he rubbed his penis until he ejaculated in the sink. She could not recall whether any touchings occurred on that date. The defendant also showed the victim magazines with "naked people." She said the defendant kept the magazines in a big box under his tool bench. She stated that the defendant showed her movies of people having sex. The victim related that the defendant had a Polaroid camera that they used to photograph each other naked and sometimes touching each other, with his penis in her mouth and on her "front private." The defendant kept these pictures in a shoe box in a night stand by his bed.

On cross-examination, the victim said she believed that pictures were taken at the defendant's house "anytime something was done." She recalled being able to tell the investigators the exact number of pictures kept in the shoe box. She did not recall the number of occasions pictures were taken. She denied that the defendant ever hit her.

Detective Perry Moyers with the Knox County Sheriff's Department testified that he was assigned to assist with the search of the defendant's home on July 14, 1999. He participated in the search and was responsible for finding a box of "pornographic magazines." The defendant had been taken into custody prior to the search and was handcuffed in a squad car parked outside the defendant's home. Moyers was asked to question the defendant while the search continued. The defendant indicated he would make a statement and was transported to the sheriff's department. The defendant was presented a written Miranda waiver of rights form and signed it at 12:13 a.m. on July 15, 1999. The defendant objected to tape recording his statement, and it was not recorded. Moyers' partner, Lieutenant Grissom, made notes from the defendant's statements. The defendant claimed his "involvement" with the victim had been occurring for two months. He admitted to taking pictures and showing the victim a pornographic movie. The defendant denied kissing the victim's vagina but admitted placing his penis against it. The defendant admitted attempting penetration with his penis and admitted the penis in the victim's mouth in one of the pictures was his.

On cross-examination, Detective Moyers said that the defendant denied any vaginal penetration of the victim. The defendant did not deny that the victim performed oral sex or that pictures were taken.

Detective Larry G. Moore with the Knox County Sheriff's Department was the lead investigator in this case. He testified that he had participated in an interview with the victim and her

-3-

parents on July 13, 1999. As a result of the information received, Detective Moore, with the assistance of Carleton Bryant, a legal advisor for the sheriff's department, drafted a search warrant for the defendant's home. Detective Moore and other officers executed the search warrant during the evening of July 14th. Photographs were found in a night stand in the defendant's bedroom. Also found were magazines of "Penthouse and Playboy type" and a video labeled "Best of Bloopers."

On January 15, Detective Moore and Mr. Bryant visited the defendant who was confined at the jail. Four of the confiscated photographs were shown to the defendant. The defendant identified the child in the photos as the victim and stated that he took the pictures.

Carleton Bryant testified that he assisted Detective Moore in drafting the search warrant and afterwards accompanied the officers to conduct the search. After the defendant was in custody, Bryant and Detective Moore visited the defendant at the jail to ask about one of the photographs. Bryant said that the victim was identifiable but the male adult was not. Bryant asked the defendant if the person displaying his penis in the photograph was the defendant, and the defendant affirmed that it was.

At the conclusion of the State's proof, the State announced that due to a lack of specificity by the victim, counts two and three, both child rape charges, were to be dismissed. The State relied on the photographs to show that the pictures were taken on different occasions and would support the remaining four counts of child rape. The trial court granted the defense motion pursuant to Rule 29 to dismiss count eight of the indictment, exhibition of harmful materials to minors.

Dr. Clifton R. Tennison, a psychiatrist and chief administrator at Helen Ross McNabb Center, was the first witness called by the defense. He had done two evaluations of the defendant pursuant to court orders for competency evaluations. The first evaluation was on January 4, 2001. It was brief and was terminated due to the defendant's refusal to participate. Dr. Tennison then recommended hospitalization in order to observe the defendant in an in-patient setting.

The second evaluation was done July 18, 2002. In preparation, Dr. Tennison reviewed the reports of Dr. Eric Engum, a psychologist who had evaluated the defendant twice. Dr. Tennison also reviewed the records of Lakeshore Mental Health Institute where the defendant had been hospitalized. A general psychological evaluation by Dr. Diana McCoy was also considered. Of the IQ tests made or estimated as to the defendant, the range varied between 77 and 88. Dr. Tennison concluded that the defendant had borderline intellectual functioning between 71 and 84 IQ.

During the second evaluation, Dr. Tennison interviewed the defendant for an hour, then spent another hour with the defendant's counsel present to determine if the defendant had the capacity to participate meaningfully with his attorneys. He testified that the defendant did not take responsibility for his actions which lead to the criminal charges.

He said Dr. McCoy's report reflected that the defendant suffered from depression and met the criteria of schizoid personality disorder. He defined schizoid personality as being marked by

isolation, suspicion, and withdrawal. The disorder is characterized by blaming things that happen on other people and by a failure to acknowledge responsibility. Lakeshore staff diagnosis was for avoidant personality disorder and pedophilia. He characterized avoidant personality as similar to schizoid personality but that avoidant types desire to have friends and contact with others, whereas the schizoid personality does not. Dr. Engum had diagnosed the defendant as having social anxiety disorder, borderline intellectual functioning, mixed personality disorder with schizoid and avoidant features, and depression. Dr. Engum ruled out pedophilia as a diagnosis. In his own evaluation, Dr. Tennison diagnosed personality disorder with schizoid and avoidant features, social anxiety disorder, and chronic long-term tendency toward depression. He found it doubtful the defendant met the criteria for pedophilia. Further, he opined that the defendant suffered a mild impairment in his capacity to testify relevantly. Dr. Tennison attributed this to the defendant's belief that his version of events would be futile and useless. Dr. Tennison believed the defendant could testify relevantly but chose instead to blame others.

On cross-examination, Dr. Tennison stated that his ultimate conclusion was that the defendant was competent to stand trial. He noted that was the conclusion of Dr. Engum as well in his first evaluation. Dr. Tennison found no presence of psychosis, disabling anxiety or depression, or formal thought disorder.

The defendant testified that he was forty-six years old. He had known the victim's parents for over twenty years. He stated that he spent a lot of time at their home, worked on their cars, painted their house inside twice and outside once, and performed a lot of yard work. He testified that the victim's parents allowed the victim to watch sexually explicit movies on the Playboy channel. The defendant stated he refused to sign the summarized statement he made to the sheriff's detectives because he could not read it.

During cross-examination, the defendant admitted that he knew the victim's age. He stated that he had lost all of his possessions due to a civil suit brought by the victim's parents. He admitted that pictures of the victim and himself were taken at his home.

**Analysis**

Search Warrant

The defendant contends that the trial court erred by its failure to suppress the evidence seized pursuant to the search warrant. The first basis of the defendant's argument is that there was non-compliance with Tennessee Rule of Criminal Procedure 41(c). The pertinent portion of the rule is:

> The magistrate shall prepare an original and two exact copies of the search warrant, one of which shall be kept by the magistrate as a part of his or her official records, and one of which shall be left with the person or persons on whom the search warrant is served. The magistrate shall endorse upon the search warrant the hour, date, and name of the officer to whom the warrant was delivered for execution; and the exact copy of the search warrant and the endorsement thereon shall be admissible evidence.

Failure of the magistrate to make said original and two copies of the search warrant or failure to endorse thereon the date and time of issuance and the name of the officer to whom issued, or the failure of the serving officer where possible to leave a copy with the person or persons on whom the search warrant is being served, shall make any search conducted under said search warrant an illegal search and any seizure thereunder an illegal seizure.

"[W]hen a trial court's findings of fact at a suppression hearing are based on evidence that does not involve issues of credibility, a reviewing court must examine the record de novo without a presumption of correctness." State v. Binette, 33 S.W.3d 215, 217 (Tenn. 2000). Whether Rule 41(c) of the Tennessee Rules of Criminal Procedure requires suppression of the evidence in this case is a question of law which we review de novo with no presumption of correctness afforded to the trial court's findings.

Indisputably, there are differences in the original affidavit to the search warrant and the copy retained by the executing officer and the copy left at the defendant's residence. The differences are that on the original affidavit the issuing magistrate's name is omitted from the blank space left for that purpose. The magistrate's name is written in at this space on the copy left at the defendant's home. A handwritten insert of "inappropriate sexual" and separately, the word "of" was initialed on the defendant's copy, but not on the original copy. Page three of the affidavit had initials by the word "brag" on the defendant's and officers' copy, but were not on the original affidavit. The search warrant itself contained the following language in prominent type:

AFFIANT'S AFFIDAVIT IS HEREBY EXPRESSLY INCORPORATED BY REFERENCE AND MADE A PART HEREOF.

The State urges us to consider the affidavit as a separate document exempt from the technical requirements of Rule 41(c), despite the language of incorporation. It is well settled that an affidavit upon which a search warrant is issued does not become a part of the search warrant even if it appears on the same form. Minton v. State, 186 Tenn. 541, 212 S.W.2d 373, 374 (1948); State v. Price, 46 S.W.3d 785, 809 (Tenn. Crim. App. 2000); State v. Smith, 836 S.W.2d 137, 141 (Tenn. Crim. App. 1992). But to ignore clear and unequivocal language of incorporation by reference would render plain language meaningless. O'Brien v. State, 158 Tenn. 400, 14 S.W.2d 51 (1929), held that when an affidavit is incorporated by the warrant with proper reference, then it is a part of the search warrant.

Affidavits, when properly incorporated by reference, have been utilized to satisfy insufficiencies of description in the search warrant. Hackerman v. State, 189 Tenn. 130, 135, 223 S.W.2d 194, 196 (1949); O'Brien, 158 Tenn. at 403, 14 S.W.2d 51; see Smith, 836 S.W.2d at 141

We conclude that incorporation of an affidavit by the search warrant embodies the affidavit as a part of the search warrant and is thus subject to the requirements of Rule 41(c). Next, we consider whether the anomalies described in the incorporated affidavit are fatal under the mandatory requirements of Rule 41(c).

Rule 41(c) derives from a predecessor statute, Tennessee Code Annotated section 40-518 (repealed 1979). Our appellate courts have scrupulously adhered to the mandatory language of both the prior statute and the current Rule 41(c) and have suppressed evidence when a violation of the provisions was shown. See State v. Coffee, 54 S.W.3d 231 (Tenn. 2001); Johnson v. State, 208 Tenn. 620, 348 S.W.2d 295 (1961); Talley v. State, 208 Tenn. 275, 345 S.W.2d 867 (1961); State v. Steele, 894 S.W.2d 318 (Tenn. Crim. App. 1994); State v. Grapel Simpson, et al., No. 02C01-9508-CC-00240, 1996 Tenn. Crim. App. LEXIS 612 (Tenn. Crim. App. at Jackson, Sept. 30, 1996).

The rationale for this zealous protection has been set forth in our appellate opinions. The procedural safeguards are intended "to secure the citizen against carelessness and abuse in the issuance and execution of search warrants." Talley, 208 Tenn. at 278, 345 S.W.2d at 869.

> The provision at issue, that a magistrate prepare and retain a copy of the search warrant, endeavors to prevent improper searches and facilitate judicial review of whether a search was executed within the scope of the warrant. The rule achieves its goals in that a written record of the specifics of the search stifles the ever-present temptation for an officer to conduct a search and justify it later. Additionally, the copy of the warrant enables review of the original boundaries of a search; without an exact copy of the warrant, review is compromised because the critical facts and details of the warrant cannot be precisely determined. It is for these reasons that it is important to retain an exact copy of the warrant identifying the property or person to be searched, and it is for these same reasons that this requirement has been strictly enforced by our courts for many years.

Coffee, 54 S.W.3d at 233-34.

"The purpose of having the magistrate retain a copy of the search warrant is to insure the purity of the search process." State v. Gambrel, 783 S.W.2d 191, 192 (Tenn. Crim. App. 1989).

It is apparent that these safeguards exist to guard against the possibility of after-the-fact manipulation of the search documents. When the discrepancies in the copies in this case are viewed in that light, they are insignificant. The variances neither expand the scope of the search, cast doubt on the supporting probable cause or in any way affect the "purity of the search." We continue to adhere to the mandatory requirements of Rule 41(c) and do not intend to erode the safeguards protected by its provision. However, suppression of the evidence due to the insignificant variances under these facts would, in our opinion, be hyper-technical and counter-productive.

The defendant's next issue is that the search warrant violated the provisions of Tennessee Code Annotated section 39-17-1007. The search warrant was issued, in part, for violations of the Tennessee Protection for Children Against Sexual Exploitation Act of 1990 (Tenn. Code Ann. §§ 39-17-1001 - 39-17-1007). Tennessee Code Annotated section 39-17-1007 provides as follows:

> No process except as otherwise provided shall be issued for the violation of §§ 39-17-1003 - 39-17-1005 unless it is issued upon the application of the district attorney general of the district.

It is undisputed that the District Attorney General's office had no involvement in seeking or obtaining issuance of the search warrant. The defendant contends that this failing renders the search warrant invalid for all purposes and susceptible to suppression of the items seized pursuant to the search warrant.

The State responds that the "process" refers to the immediate preceding section, Tennessee Code Annotated section 39-17-1006, dealing with injunctions and indictments for violators and not to search warrants. The State further argues that in the context of the subject statutes, a search warrant is not contemplated as "process." Both the defendant and the State purport to rely on statutory construction to reach their divergent conclusions.

The trial court held that a search warrant was within the meaning of "process" under the subject act but noted that the search warrant was justified under violations of child rape and aggravated sexual battery and not dependant solely on the sexual exploitation of minors. The trial court also held the search warrant was legally granted under the "except as otherwise provided" language of Tennessee Code Annotated section 39-17-3007.

> In pertinent part, the search warrant reads as follows:
> That affiant has reason to believe and does believe that TIMOTHY WADE DAVIS, ALIAS, (suspect) is (State the illegal activity and the evidence or contraband sought) IN POSSESSION OF CERTAIN EVIDENCE OF A CRIME, TO-WIT: VIOLATIONS OF T.C.A. 39-13-504 (RAPE OF A CHILD) AND 39-13-504 (AGGRAVATED SEXUAL BATTERY) AND THE TENNESSEE PROTECTION OF CHILDREN AGAINST SEXUAL EXPLOITATION ACT OF 1990, AND THE EVIDENCE TO BE SEARCHED FOR AS IS FOLLOWS: ONE POLAROID CAMERA, PHOTOGRAPHS OF [THE VICTIM/AFFIANT], PHOTOGRAPHS OF TIMOTHY WADE DAVIS, MOVIES OR VIDEOTAPES OF NAKED MEN AND NAKED WOMEN, AND MAGAZINES CONTAINING PICTURES OF NUDE MEN AND NUDE WOMEN . . .

Tennessee Code Annotated section 39-17-1007 is broad enough to include a search warrant and that involvement of the district attorney general was required under the Sexual Exploitation of Minors Act, but we are unconvinced that this flaw is fatal to the search warrant's validity. The search warrant is independently justified by the alleged violations of rape of a child and aggravated sexual battery. The inclusion of the alleged violation of the sexual exploitation of minors does not act to nullify these valid assertions. Nor does it serve to grant immunity to the defendant for prosecution under the sexual exploitation act. The search warrant was independently justified by valid allegations, free of any taint from statutory prohibitions or constitutional violations. The subsequent search, even if sexual exploitation of minors was not invoked, would inevitably have resulted in discovery of the photographs which supported the defendant's conviction for sexual exploitation of a minor. See Nix v. Williams, 467 U.S. 431, 433, 104 S. Ct. 2501, 2509, 81 L. Ed. 2d 377 (1984); State v. Harmon, 775 S.W.2d 583, 586-87 (Tenn. 1989).

Defendant's Statements

The defendant's next contention is that his statements, taken during and after the conduct of the search, were fruits of the poisonous tree and, therefore, deserving of suppression. For purposes of further review, we will consider the defendant's arguments.

If, upon further review, the search warrant is deemed invalid, then we would conclude that the statements given by the defendant were indeed induced by an invalid search.

Detective Moore testified at the suppression hearing that at the initiation of the execution of the search warrant, the officers "told him basically what we were looking for." Detective Moore also stated that the warrant was read to the defendant. The defendant was then handcuffed, arrested, and placed in a police cruiser while the officers began their search. Detective Moyers participated in the initial stages of the search before being dispatched to ascertain whether the defendant was willing to make a statement. Moyers first gave the defendant Miranda warnings and asked the defendant if he would speak about the circumstances. The defendant responded by saying, "You already know what's going on." Although Moyers had not seen the pictures seized in the defendant's home, he was aware of their alleged existence. Moyers had taken the defendant to the sheriff's department and re-administered the Miranda warnings. Moyers specifically asked the defendant if he had taken pictures and if the penis pictured in the victim's mouth was that of the defendant's.

On July 15, 1999, the day after the defendant's arrest, the defendant was interviewed again by Detective Larry Moore and Carleton Bryant. On that occasion, the defendant was shown pictures seized from his home and was specifically questioned about them. The defendant made confessions during both interviews.

The trial court ruled that should the search warrant be invalid, the first interview was not based on the evidence seized from the search and would, therefore, be admissible, but expressed reservations as to the second interview. Having held the search valid, the trial court did not rule specifically on the second interview.

Unless the evidence preponderates against them, the trial court's findings of fact in a suppression hearing will be upheld on appeal. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). If the issue involves an application of law to undisputed facts, the appellate courts conduct a de novo review as to the question of law. State v. Troxell, 78 S.W.3d 866, 870 (Tenn. 2002).

The "fruit of the poisonous tree" analysis is the test for determining admissibility of a confession elicited by use of an illegal search. Brown v. Illinois, 422 U.S. 590, 591-92, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975); State v. Huddleston, 924 S.W.2d 666, 674 (Tenn. 1996). Under this analysis, the focus is on whether the evidence was obtained by exploitation of the Fourth Amendment illegality. Huddleston, 924 S.W.2d at 674. The burden of proving admissibility of the challenged evidence is on the prosecution by a preponderance of the evidence standard. Id. at 675. The ultimate finding should be reached by consideration of four factors:

1. The presence or absence of <u>Miranda</u> warnings;
2. The temporal proximity of the search and the confession;
3. The presence of intervening circumstances; and
4. The purpose and flagrancy of the official misconduct.

<u>State v. Ford</u>, 30 S.W.3d 378, 381 (Tenn. Crim. App. 2000) (citing <u>Huddleston</u>, 924 S.W.2d at 675).

Under the instant facts we note that the defendant received his <u>Miranda</u> warnings preceding each interview and confession. However, the warnings do not break the causal chain between an illegal search and a subsequent confession. <u>Ford</u>, 30 S.W.3d at 382.

The first statement taken from the defendant was begun during the ongoing search but after some incriminating items were found. The defendant was read the search warrant at the onset of the search and was made aware of what items the officers were seeking. The defendant's initial response to Detective Moyers, "you already know what's going on," strongly indicated the defendant's assumption that the incriminating photographs had been or soon would be found. This weighs in the defendant's favor.

There were no intervening circumstances of significance that would remove the taint of illegally seized evidence. In fact, the second interview on the day after the defendant's arrest, he was confronted with and questioned about certain seized photographs. This factor weighs in favor of suppression.

The last factor, flagrancy of the misconduct, weighs in favor of admissibility. From our review, it appears that the officers involved took every reasonable precaution to protect the defendant's constitutional rights in the course of their investigation. Taking all factors into consideration, we conclude that the confessions should be suppressed. The defendant was clearly convinced that the incriminating evidence had been or would inevitably be found during the search. That realization would have served as significant encouragement for the defendant to speak. The State, under this scenario, has not shown the confessions to be an act of free will that would purge the taint of an assumed invalid search.

Self Representation

The defendant next contends that the trial court erred in refusing his request to represent himself or alternatively failed to conduct an inquiry concerning the request. At the conclusion of the defendant's competency hearing on November 15, 2002, wherein the defendant was found competent to stand trial, the defendant addressed the court in the following exchange:

THE DEFENDANT: If I'm competent to stand trial, then I don't want him or him to be my lawyer. I will defend myself, will not allow any of these -- because he didn't do his job. He's supposed to appeal the warrant that this detectives had on me and -- and -- the first lawyer that you appointed to me -- said that he was

|  |  |
|---|---|
| | supposed to have appealed what you had on the warrant, but he didn't do it.  He didn't do his job. |
| THE COURT: | Well, that issue is not before me today.  The case is -- |
| THE DEFENDANT: | Well -- |
| THE COURT: | --set for March 31st.  Thank you, gentlemen. |
| [COUNSEL]: | Thank you, Your Honor. |
| THE DEFENDANT: | Well, I don't want them for my lawyer.  I already told you that. |
| [BAILIFF]: | Let's go, [the defendant]. |
| THE DEFENDANT: | I'm going. |

The next occasion that the defendant asserted a desire to represent himself was on March 31, 2003, the day of trial.  After being advised of the defendant's request by the defendant's counsel, the trial court attempted to discuss the perils of self-representation.  The trial court recounted the defendant's past history in regard to his attorneys.  Due to the defendant's stated desire, his original retained attorney was allowed to withdraw and the public defender was appointed as the defendant's counsel.  A month later, another private attorney was appointed as co-counsel.  These attorneys requested a continuance on December 3, 2001, due to the defendant's failure to cooperate or meet with them in preparation of his defense.  As a result, the defendant's original bond was revoked and a higher bond set.  The defendant had been in custody since that time.  The trial court conducted a lengthy colloquy with the defendant.  The defendant stated he could not read but should have a legal aide.  The defendant complained that he was harassed by his neighbors prior to his being placed in custody.  The trial court attempted to explain that the defendant would have to abide by all evidentiary and procedural rules in self-representation.  The defendant responded that nobody had helped him and that he could not do anything while in jail.  The colloquy concluded in the following manner:

|  |  |
|---|---|
| THE COURT: | Mr. Davis, again -- Mr. Davis, again, sir, you're getting ready to go to trial. |
| THE DEFENDANT: | Yeah. |
| THE COURT: | And an attempt to represent yourself is a grave, serious mistake. |

-11-

THE DEFENDANT: I should have the right to be able to defend -- to prepare for a trial. I don't have the right to defend for a trial when I'm locked up in a jail for 24 hours a day.

THE COURT: Mr. Davis, are you going to represent yourself, or you're going to allow these lawyers to represent you?

THE DEFENDANT: Do I have a chance to prepare for a trial?

THE COURT: No, sir. Today -- today is trial day.

THE DEFENDANT: Well, I can't accept that.

The defendant's counsel were asked by the trial court for their assessment. Their reply indicated doubt that the defendant was competent to stand trial and that the defendant was not capable of defending himself. The trial court concluded by stating that the defendant's failure to cooperate with counsel was willful and then made the following finding:

THE COURT: Well, I do not find that this is a voluntary decision on [the defendant's] part to attempt to represent himself. So I'm not going to grant that request. I don't think he -- I don't think he understands, and without an understanding, I don't think he can make a knowing, voluntary waiver of his right to counsel.

A criminal defendant has a constitutional right to represent himself. Faretta v. California, 422 U.S. 806, 820-21, 95 S. Ct. 2525, 2533-34, 45 L. Ed. 2d 562 (1975); State v. Northington, 667 S.W.2d 57, 60 (Tenn. 1984). State v. Herrod, 754 S.W.2d 627, 629-30 (Tenn. Crim. App. 1988), sets forth "three (3) essential prerequisites which must be present before the right of self-representation becomes absolute. First, the accused must assert the right to self-representation timely. Second, the accused's request must be clear and unequivocal. Third, the accused must knowingly and intelligently waive the right to the assistance of counsel." (citations omitted). The accused's "technical legal knowledge" is irrelevant to the inquiry as to whether an accused be permitted self-representation. Faretta, 422 U. S. at 836, 95 S. Ct. at 2541, 45 L. Ed. 2d at 582.

In the case at hand, the trial court found that the defendant had not made a knowing, voluntary waiver of counsel. The colloquy also illustrates that the defendant's request was not unequivocal. His request on the day of trial was not timely and was seemingly conditioned on a release from jail, additional time for trial preparation and appointment of a legal aide for assistance. It is significant that the trial court relied on the testimony of Dr. Tennison during the competency hearing. Dr. Tennison had concluded that the defendant's impairment in relating to his attorneys in trial preparation was due to the defendant's choice not to cooperate. The defendant's history of placing impediments in the way of his various attorneys was extensive. The trial court's attempts to discuss the nature of the charges, the statutory offenses included, the range of allowable punishment, and possible defenses were met with irrelevant complaints by the defendant of

harassment or self-inflicted disabilities, such as his incarceration. The defendant himself recognized that he could not proceed effectively without the appointment of a legal aide and other conditions. A criminal defendant may implicitly waive or forfeit the right of counsel by utilizing that right in an effort to manipulate, delay, or disrupt trial proceedings. State v. Carruthers, 35 S.W.3d 516, 549 (Tenn. 2000). Accordingly, we conclude that the record supports the trial court's finding a lack of a knowing and voluntary waiver and an implicit waiver by the defendant's actions to delay or disrupt the trial proceedings.

## Jury Instruction

The defendant next asserts that the trial court's failure to instruct the jury on the insanity defense resulted in a violation of the defendant's constitutional rights to due process and a fair trial.

Insanity is pursuant to statute, an affirmative defense, Tennessee Code Annotated section 39-11-501:

> (a) It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of such defendant's acts. Mental disease or defect does not otherwise constitute a defense. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.
> (b) As used in this section, "mental disease or defect" does not include any abnormality manifested only by repeated criminal or otherwise antisocial conduct.

In order for submission of an affirmative defense to be submitted to a jury, the issue must be "fairly raised by the proof." Tenn. Code Ann. § 39-11-204(d). To determine if the issue is fairly raised by the proof, "a court must, in effect, consider the evidence in the light most favorable to the defendant, including drawing all reasonable inferences flowing from that evidence." State v. Shropshire, 874 S.W.2d 634, 639 (Tenn. Crim. App. 1993); see State v. Bult, 989 S.W.2d 730, 732-733 (Tenn. Crim. App. 1998).

Dr. Clifton Tennison, a psychiatrist, was called on behalf of the defense. His testimony was previously summarized in this opinion. Dr. Tennison based his diagnosis on his two personal evaluations and a review of four other evaluations by mental health experts. Dr. Tennison found that the defendant had borderline intellectual functioning but was not retarded. Dr. Tennison found that the defendant suffered from several personality disorders including both schizoid and avoidant personality features. Significantly though, neither Tennison or any other evaluation found evidence of a psychosis dissociation or disabling anxiety or depression or formal thought disorder. In summary, there was no proof presented of a severe mental disease or defect that disabled the defendant from an ability to appreciate the nature or wrongfulness of his acts. The defense failed to carry the burden of proving insanity by clear and convincing evidence. The defense was not fairly raised by the evidence, and the trial court properly refused to submit the affirmative defense to the jury.

<u>Competency</u>

The defendant's next issue alleges that the trial court erred in finding the defendant competent to stand trial.

The trial of mental incompetents is barred by the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution. <u>Pate v. Robinson</u>, 383 U.S. 375, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966); <u>State v. Blackstock</u>, 19 S.W.3d 200 (Tenn. 2000). The standard for determining competency is whether the accused has 'the capacity to understand the nature and object of the proceedings against him, to consult with counsel and to assist in preparing his defense.' <u>State v. Black</u>, 815 S.W.2d 166, 174 (Tenn. 1991) (quoting <u>Mackey v. State</u>, 537 S.W.2d 704, 707 (Tenn. Crim. App. 1975)). The burden is on the defendant to establish his incompetency to stand trial by a preponderance of the evidence. <u>State v. Leming</u>, 3 S.W.3d 7, 13-14 (Tenn. Crim. App. 1998).

The issue of the defendant's competency to stand trial was diligently explored in two separate competency hearings. In the first, testimony from Dr. Eric Engum, a psychologist, was heard. Dr. Engum stated that he had originally found the defendant competent but had on a subsequent evaluation observed troubling features of the defendant's distrust of his attorneys, refusal to discuss a plea bargain, and an inability to understand that his actions constituted criminal offenses. Dr. Engum recommended further evaluation, and the trial court ordered another competency evaluation. The subsequent competency evaluation was conducted by Dr. Tennison. During the second competency hearing, Dr. Tennison testified as follows:

> My finding was that he had no incapacity with regard to 10 of the 15 areas that we examine defendants on. Those include his capacity to understand the arrest process; the appreciation of the charges against him; understanding of court procedure; understanding of the legal process; appraisal of key figures in the courtroom; capacity to disclose to his attorney the pertinent facts surrounding the alleged offenses; his appreciation of the range in nature of possible penalties; his appraisal of the likely outcome; his capacity to challenge the prosecution; and his capacity to manage his behavior appropriately in the courtroom.

> I found a mild degree of incapacity with regard to two areas: his capacity to testify relevantly and whether or not he has a self-defeating or self-serving motivation in the legal sense. I found a moderate degree of incapacity in three areas: the quality of relating to his attorney; his capacity to realistically appraise available legal defenses; and his capacity to assist in the planning of legal strategy. The final outcome of all of this was that I found that he was mildly impaired with regard to these -- with regard to these incapacities, but that overall he met the criteria for fitness to stand trial.

Dr. Tennison stated that the defendant's inability to relate to his attorneys appeared to be the defendant's choice based on his characterologic style, but not from dementia or psychosis. Based on this testimony, the trial court properly ruled that the defendant was competent to stand trial.

Sentencing

The defendant's final issue on appeal concerns alleged errors in sentencing. The defendant maintains that the trial court erroneously failed to apply two mitigating factors: (1) that the defendant's mental condition significantly reduced his culpability, Tenn. Code Ann. § 40-35-113(3), and (2) absence of a criminal record, Tenn. Code Ann. § 40-35-113(13). Additionally, the defendant contends that it was improper to impose consecutive sentences pursuant to Tennessee Code Annotated section 40-35-115(b)(5).

The trial court found two enhancing factors: Tenn. Code Ann. § 40-35-114(8), the offense was committed to gratify the defendant's desire for pleasure or excitement, and Tenn. Code Ann. § 40-35-114(16), the defendant abused a position of private trust. The defendant does not dispute the applicability of the enhancement factors.

The trial court imposed sentences of twenty-two years for each of the four rape of a child convictions and ran three consecutively with one running concurrently. A sentence of ten years for aggravated sexual exploitation of a minor was imposed to run consecutively. The total effective sentence was seventy-six years.

This Court's review of the sentence imposed by the trial court is de novo with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d). This presumption is conditioned upon an affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999). If the trial court fails to comply with the statutory directives, there is no presumption of correctness and our review is de novo. State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997).

The burden is upon the appealing party to show that the sentence is improper. Tenn. Code Ann. § 40-35-401(d), Sentencing Commission Comments. In conducting our review, we are required, pursuant to Tennessee Code Annotated section 40-35-210(b), to consider the following factors in sentencing:

> (1) [t]he evidence, if any, received at the trial and the sentencing hearing; (2) [t]he presentence report; (3) [t]he principles of sentencing and arguments as to sentencing alternatives; (4) [t]he nature and characteristics of the criminal conduct involved; (5) [e]vidence and information offered by the parties on the enhancement and mitigating factors in §§ 40-35-113 and 40-35-114; and (6) [a]ny statement the defendant wishes to make in the defendant's own behalf about sentencing.

If no mitigating or enhancement factors for sentencing are present, Tennessee Code Annotated section 40-35-210(c) provides that the presumptive sentence for most offenses shall be the minimum sentence within the applicable range. State v. Lavender, 967 S.W.2d 803, 806 (Tenn. 1998); State v. Fletcher, 805 S.W.2d 785, 788 (Tenn. Crim. App. 1991). However, if such factors do exist, a trial court should enhance the minimum sentence within the range for enhancement factors and then reduce the sentence within the range for the mitigating factors. Tenn. Code Ann. § 40-35-210(e); State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). No particular weight for each factor is prescribed by the statute, as the weight given to each factor is left to the discretion of the trial court as long as the trial court complies with the purposes and principles of the sentencing act and its findings are supported by the record. State v. Madden, 99 S.W.3d 127, 138 (Tenn. Crim. App. 2002); *see* Tenn. Code Ann. § 40-35-210, Sentencing Commission Comments. Nevertheless, should there be no mitigating factors, but enhancement factors are present, a trial court may set the sentence above the minimum within the range. Tenn. Code Ann. § 40-35-210(d); State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002).

Rape of a child is a Class A felony, Tenn. Code Ann. § 39-13-522, for which the presumptive sentence is the midpoint of the range, Tenn. Code Ann. § 40-35-210(c). The sentence range for a Range I offender for a Class A felony is fifteen to twenty-five years. Tenn. Code Ann. §§ 39-13-522(b), 40-35-112(a)(1). The sentence range for especially aggravated sexual exploitation of a minor, a Class B felony, is eight to twelve years. Tenn. Code Ann. §§ 39-17-1005(c), 40-35-112(a)(2). After finding two enhancement factors and no mitigating factors, the trial court increased the sentences for rape of a child from the presumptive twenty years to twenty-two years and increased the presumptive sentence of eight years for aggravated sexual exploitation of a minor from eight to ten years.

The trial court agreed that the defendant suffered from a variety of emotional problems but found no nexus between these disabilities and the criminal offenses. Tenn. Code Ann. § 40-35-113(8) reads as follows: "The defendant was suffering from a mental or physical condition that significantly reduced the defendant's culpability for the offense; however the voluntary use of intoxicants does not fall within the purview of this factor."

The record clearly establishes that the defendant suffered from a list of personality disorders, including characteristics of avoidant and schizoid personality. The defendant lived an isolated life with few close friends. The proof evinced that the defendant's perspective was skewed by oddities of thought and distortions. He was diagnosed as externalizing his problems and blaming others or rationalizing his own offenses. He had borderline intellectual functioning with an IQ estimated between 71 and 84. The defendant claimed he could not read and was described both as illiterate and as having a reading disorder.

Despite what most would consider a bizarre lifestyle and outlook, the defendant managed his own affairs. He held employment, owned and maintained a household, acquired vehicles, and presumably held a driver's license. Despite the defendant's various disorders, we are unconvinced that they "significantly reduced the defendant's culpability" for the egregious offenses that he

inflicted on a six or seven-year-old child. Accordingly, we agree with the trial court's finding that this mitigating factor was not applicable.

The fact that the defendant had no prior criminal history was known by the trial court through the pre-sentence report despite not being raised at the sentencing hearing. The defendant now asserts that it should have been applied under Tennessee Code Annotated section 40-35-113(13). This Court has previously held that this aspect is not required to be applied in mitigation. See State v. Williams, 920 S.W.2d 247, 261 (Tenn. Crim. App. 1995). However, it is "appropriately considered in mitigation." State v. Gutierrez, 5 S.W.3d 641, 646-47 (Tenn. 1999). We therefore conclude that this mitigating factor should have been considered in sentencing. However, the trial court only enhanced each sentence two years as opposed to a possible five years for aggravated sexual exploitation of a minor. The statutes prescribe no particular weight for an enhancement or mitigating factor. State v. Gosnell, 62 S.W.3d 740, 750 (Tenn. Crim. App. 2001). In the face of the strength of the enhancement factors after considering the one mitigating factor, we conclude in our de novo review that the sentences, as imposed, are appropriate.

## Consecutive Sentencing

The defendant's concluding issue is to take issue with the trial court's imposition of consecutive sentencing. Tennessee Code annotated section 40-35-115 provides in pertinent part:

(a)     If a defendant is convicted of more than one (1) criminal offense, the court shall order sentences to run consecutively or concurrently as provided by the criteria in this section.

(b)     The court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:

. . .

(5)     The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims.

In imposing consecutive sentences, the trial court considered aggravating circumstances and made the following observations:

We have an abuse of a private trust position, a period of time and -- an extended period of time under which there have been multiple acts. Clearly there's been residual physical and mental damage to the victim, and it went undetected for

this period of time that -- these acts were being committed and photographs were being taken.

The time span of the undetected offenses is uncertain. The testimony of the victim indicated that the touching by the defendant began when she was between first and second grades. This would have been in 1997 and covered an approximate two-year period. The defendant argues that the time period was approximately two months. Regardless, it is undisputed that the defendant took advantage of his close relationship with the victim and her family for his own sexual gratification. Due to his twenty-year friendship with the victim's family, he was given extraordinary trust which he abused. The pictures of the defendant and victim engaged in sexually explicit acts, which were kept by his bedside and frequently shown to the victim, served as a further aggravating circumstance.

The victim impact statement by the mother of the victim indicated that the family had been attending weekly counseling sessions for almost four years. She stated the victim still had trouble concentrating, remained fearful and had been irregular in school attendance. The victim's impact statement indicated that she felt alone, different, and has nightmares. She feared the defendant would hurt her again.

The defendant has submitted two cases in support of his contention for concurrent sentences; State v. Hayes, 899 S.W.2d 175 (Tenn. Crim. App. 1995), and State v. James M. Powers, No. E2001-02363-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 889 (Tenn. Crim. App. at Knoxville, Oct. 23, 2002). We find both cases readily distinguishable from the instant case. Both offenses were characterized by this Court as non-aggravated conduct. The photographs in this record of the sexually explicit acts belie any such attempted characterization herein. We find State v. Lane, 3 S.W.3d 456 (Tenn. 1999), more apposite to our case at hand. Lane involved an appeal of consecutive sentences for statutory rape and unlawful exercise of official power. The defendant in Lane was a Department of Human Services counselor who had sexual intercourse for "over a month" with a sixteen-year-old female in state custody. Our Supreme Court found the conduct "reprehensible"; that the record supported that the victim suffered from "residual mental damage," and found those facts sufficient aggravating circumstances to uphold consecutive sentences. Lane, 3 S.W.3d at 459-60. See also State v. Woodcock, 922 S.W.2d 904, 915 (Tenn. Crim. App. 1995).

### Conclusion

Based upon the foregoing analysis and the record as a whole, we affirm the convictions and the sentences as imposed.

_____
JOHN EVERETT WILLIAMS, JUDGE

-18-